IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| OWNERS INSURANCE CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 1:20-cv-967-ECM |
| | ) | [WO] |
| PAMELA KEEBLE, *d/b/a* KEEBLE | ) | |
| ENTERPRISES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER

### I. INTRODUCTION

Now pending before the Court are Plaintiff Owners Insurance Co.'s ("Owners" or "Plaintiff") motion for summary judgment (doc. 35) and Defendants Pamela Keeble, d/b/a Keeble Enterprises, Eric Toliver, and Kelsea[1] Toliver's (collectively, "Defendants") motion to strike hearsay evidence (doc. 40).

The Plaintiff filed a Complaint for Declaratory Judgment on November 23, 2020, seeking a declaration regarding what benefits, if any, it owes to Eric and Kelsea Toliver under the applicable insurance policy.  The Plaintiff moves for summary judgment, asserting that it owes no coverage to either Mr. or Mrs. Toliver.  Additionally, the Plaintiff argues that, if it does owe coverage, Mrs. Toliver's claim does not increase the applicable

---

[1] Mrs. Toliver's first name is spelled "Kelsey" in the case caption.  However, it appears to the Court that this is a typographical error and the correct spelling is "Kelsea."  Mrs. Toliver spelled her name "Kelsea" in her deposition, and the parties refer to her as "Kelsea" in the summary judgment briefing.

policy limits because her claim does not trigger a separate "per person" limit, and even if it did, the claims remain subject to the policy's "per occurrence" limit.  In response, the Defendants argue that Mr. and Mrs. Toliver are entitled to coverage because they are "relatives" of the named insured, and alternatively that they are entitled to coverage under Alabama's Uninsured Motorist Statute, Ala. Code § 32-7-23.  Additionally, the Defendants argue that Mrs. Toliver's claim triggers a separate "per person" limit under the policy.

Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the Plaintiff's motion for summary judgment is due to be GRANTED IN PART and DENIED IN PART, and the Defendants' motion to strike is due to be DENIED as moot.

## II.  JURISDICTION

The citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Doc. 1).  Therefore, the Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.  Personal jurisdiction and venue are uncontested.

## III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla.*

2

*Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311. The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or

3

that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252.   Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.*   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV.  FACTS

The facts, stated in the light most favorable to the non-movants, are as follows:

On August 8, 2020, Eric Toliver was operating a motorcycle when he was struck by a car.  Mr. Toliver suffered serious injuries requiring the amputation of his right leg.  Mr. Toliver had no insurance.  The at-fault driver had limited insurance coverage, and Mr. Toliver's medical expenses exceeded the at-fault driver's policy limit.  Mr. and Mrs. Toliver filed a claim under an insurance policy (the "Policy") that Owners issued to Keeble Enterprises, a car business owned and operated by Pamela Keeble.  Mrs. Keeble is Mrs. Toliver's mother and Mr. Toliver's mother-in-law.  Mr. Toliver made a claim for underinsured motorist benefits, and Mrs. Toliver made a claim for loss of consortium.

The Policy's Garage Liability Coverage provides Uninsured Motorist Coverage to the named insured (Pamela Keeble), the insured's spouse (Jody Keeble), and a "relative":

2. COVERAGE

\*\*\*

b. If the first Named Insured in the Declarations is an individual, this coverage is extended as follows:

(1) We will pay compensatory damages, including but not limited to loss of consortium, you are legally entitled to recover from the owner or operator of an uninsured auto because of bodily injury you sustain . . . (b) [w]hile occupying an auto which is not covered by SECTION II - COVERAGE of the policy.

(2) The coverage extended in 2.b.(1) is also afforded to a relative.

(Doc. 36-1 at 65) (emphasis omitted).  The Policy defines "you" to mean "the named insured," i.e., Pamela Keeble, "and if an individual, your spouse who resides in the same household." (*Id.* at 21, para. LL).  The Policy defines "relative" to mean "a person who resides with you and who is related to you by blood, marriage or adoption." (*Id.* at 20, para. X).

The Uninsured Motorist Coverage is subject to a $300,000 limit for "each person" and a $300,000 limit for "each occurrence," each stackable three times for a total of $900,000 for "each person" and $900,000 for "each occurrence."  The Policy defines "occurrence" to mean "an accident." (*Id.* at 19, para. R).  "The limit for 'each occurrence'" is the maximum Owners will pay "for all compensatory damages, including but not limited to loss of consortium, because of bodily injury to two or more persons in any one occurrence." (*Id.* at 66, para. 4(b)) (emphasis omitted).  Additionally, "[t]he Limit of Insurance is not increased because of the number of . . . [c]laims made or . . . [p]ersons involved." (*Id.* at 66, para. 44(c)).

Additionally, the Policy contains an Amendatory Endorsement regarding liability coverage.  The Endorsement states in relevant part:

5

[W]e will also pay damages for bodily injury and property damage for which the insured becomes legally responsible because of or arising out of:

***

(b) An auto, mobile equipment or farm implement you do not own or lease which is not used in connection with your business (other than a motorcycle, moped, motor scooter, midget auto or go cart), when used by:

　　1) You;

　　2) Any person to whom you regularly furnish an auto, mobile equipment or farm implement or their spouse, if a resident of the same household;

　　3) Your relatives not owning an auto, mobile equipment or farm implement; or

　　4) Any person not owning an auto, mobile equipment or farm implement who resides with any person shown in 1), 2) or 3) immediately above to whom you regularly furnish an auto, mobile equipment or farm implement and who is related to such person or his or her spouse by blood, marriage or adoption including a ward or foster child who resides with such person.

(*Id.* at 74) (emphasis omitted).  Mrs. Toliver drives a van owned by Keeble Enterprises.

Mr. and Mrs. Toliver filed claims seeking underinsured motorist coverage under the Policy.  Mrs. Toliver's claim was for loss of consortium.  After conducting an investigation, Owners determined that neither Mr. nor Mrs. Toliver was entitled to coverage and denied their claims.

In January 2020, approximately seven months prior to the motorcycle accident, Mr. Toliver was diagnosed with bipolar disorder.  His bipolar disorder made it difficult for the Tolivers to care for their two twin children and attend to other household needs. Additionally, Mrs. Toliver was in school taking online classes.  At that time, the Toliver family lived at 503 Streyer Street, Dothan, Alabama.  In January 2020, due to Mr. Toliver's medical issues and Mrs. Toliver being in school, the Toliver family moved into Mr. and

6

Mrs. Keeble's home located at 3045 Mimosa Drive, Dothan, Alabama, so that Mrs. Keeble could assist with childcare and taking care of Mr. Toliver.  The Tolivers kept their Streyer Street house and did not rent it out.  They had a fully furnished room at the Keebles' home, so they did not move any furnishings there from the Streyer Street house.  Mr. and Mrs. Toliver both testified in their depositions that they spent every night at the Keebles' home on Mimosa Drive from January 2020 through November 2020, when Mrs. Toliver finished her online program.  However, in a May 2020 application for Social Security benefits, Mr. Toliver listed 503 Streyer Street as his "Address" and wrote that he visits his "wifes [sic] parents once a week." (Doc. 49-1 at 9).  In the same application, Mrs. Toliver wrote that she and Mr. Toliver visit her parents on Sundays. (*Id.* at 17).  Additionally, Mr. Toliver listed 503 Streyer Street as his "Address" in other application documents dated July 2020.  It is undisputed that the Tolivers moved back to 503 Streyer Street in November 2020 and have resided there since.  Additionally, prior to January 2020, the Tolivers had lived at 503 Streyer Street since approximately 2017.

## V. DISCUSSION

The Court divides its discussion into five parts.  First, the Court will address Owners' argument that the Defendants should be judicially estopped from claiming that the Tolivers resided with Mrs. Keeble.  Second, the Court will address whether Owners is entitled to a declaration that it owes the Tolivers no coverage because they are not Mrs. Keeble's relatives.  Third, the Court will address the Defendants' alternative argument that the Tolivers are entitled to coverage under Alabama's Uninsured Motorist Statute.  Fourth,

the Court will address whether Mrs. Toliver's loss of consortium claim increases the Policy limits because it triggers a separate "per person" limit.  Finally, the Court will address the Defendants' motion to strike hearsay evidence.

## A.  Whether Judicial Estoppel Applies

In its reply brief, Owners argues for the first time that the Defendants should be judicially estopped from claiming that the Tolivers resided with Mrs. Keeble because the Tolivers previously made statements about the issue that are inconsistent with their deposition testimony in this case.[2]  Judicial estoppel is an equitable doctrine whose purpose is "'to protect the integrity of the judicial process' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (citations omitted).  The Eleventh Circuit "employs a two-part test to guide district courts in applying judicial estoppel: whether (1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were 'calculated to make a mockery of the judicial system.'" *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017) (en banc) (citation omitted).  "[T]o determine whether a [party]'s inconsistent statements were calculated to make a mockery of the judicial system, a court should look to all the facts and circumstances of the particular case." *Id.* at 1185.  Courts "typically also consider whether the inconsistency is clear,

---

[2] Ordinarily courts do not consider arguments or evidence presented for the first time in a reply brief. *See Hope for Families & Cmty. Serv., Inc v. Warren*, 721 F. Supp. 2d 1079, 1190 n.121 (M.D. Ala. 2010). However, the Court will consider Owners' argument because the evidence was, according to Owners, in the Defendants' possession and belatedly produced by them after Owners filed its motion for summary judgment.  The Defendants have not disputed this timeline.  Additionally, the Defendants were given the opportunity to file a sur-reply responding to the new evidence.

8

whether the party had success in persuading the earlier court to accept the position, and whether an unfair advantage or detriment would accrue in the present litigation if not estopped." *Korman v. Iglesias*, 778 F. App'x 680, 682 (11th Cir. 2019) (per curiam) (citing *Slater*, 871 F.3d at 1181).

According to Owners, the Tolivers' inconsistent statements are: (1) Mr. Toliver's listing 503 Streyer Street as his "Address" in various documents comprising his application for Social Security benefits dated May 2020 and July 2020; and (2) Mr. and Mrs. Toliver's statements in the Function Report portion of the application, dated May 2020, regarding the frequency of their visits to the Keeble home. The first part of the judicial estoppel two-part test has three components: (1) an inconsistent position; (2) made under oath; (3) in a prior proceeding. The Court will assume without deciding that the statements in the Social Security application documents were made under oath "in a prior proceeding." Because a person can have more than one address, i.e., a mailing address and a permanent address, the Court doubts that Mr. Toliver's listing Streyer Street as his "Address" in various documents constitutes an inconsistent statement. However, Mr. Toliver's statement in the Function Report that he visits his wife's parents once a week is more troubling, as it appears inconsistent with his deposition testimony in which he testified that he spent every night at Mrs. Keeble's home from January 2020 to November 2020. Similarly, Mrs. Toliver's statement in the Function Report that she and Mr. Toliver visit her parents on Sundays appears inconsistent with her deposition testimony that she spent every night at Mrs. Keeble's home from January 2020 to November 2020.

Assuming the first part of the two-part test is satisfied, the second part is not because there is insufficient evidence from which the Court can conclude that the Tolivers intended to make a mockery of the judicial system. Owners suggests that the mere fact of the Tolivers' inconsistent statements on the Social Security application documents evinces an intent to make a mockery of the judicial system. But if the mere existence of a prior inconsistent statement sufficed to show an intent to make a mockery of the judicial system, the second part of the two-part test would essentially collapse into the first. Moreover, this approach would be inconsistent with the en banc Eleventh Circuit's directive to evaluate all the facts and circumstances of the case. Additionally, the en banc Eleventh Circuit has held that, in the bankruptcy context, the mere failure to disclose a civil claim in a bankruptcy petition does not permit an inference that the debtor intended to make a mockery of the judicial system, overruling prior precedent. *Slater*, 871 F.3d at 1185. One reason the Eleventh Circuit overruled its prior precedent and adopted the all-facts-and-circumstances standard was to "ensure[] that judicial estoppel is applied only when a party acted with a sufficiently culpable mental state." *Id.* at 1185–86. The Court thus finds Owners' argument unavailing and declines to apply judicial estoppel given the lack of evidence of the Tolivers' mental state.

To the extent that the Tolivers' making inconsistent statements on the Social Security application documents alone evinces an intent to make a mockery of the judicial system, the Court nonetheless would in its discretion decline to apply judicial estoppel. *See id.* at 1180 ("[A] district court *may* apply judicial estoppel when a two-part test is satisfied."

(emphasis added)).   The Court discerns no evidence indicating that the Social Security Administration ("SSA") accepted the Tolivers' position that they visited the Keebles only once per week. *See Korman*, 778 F. App'x at 682.   This lack of evidence weighs against applying judicial estoppel.   And in their sur-reply, the Defendants present evidence demonstrating that Mr. Toliver's May 2020 applications for Social Security benefits (both SSI and disability insurance) were denied. (Doc. 59-3; doc. 59-4).   Similarly, Mr. Toliver's application for reconsideration after the accident was denied on October 21, 2020. (Doc. 59-5).   The original denials were based on SSA's determination that Mr. Toliver could still perform some work. (Doc. 59-3 at 6; doc. 59-4 at 7).   The reconsideration denial was based on SSA's determination that Mr. Toliver had not demonstrated he had been unable to perform any work for twelve consecutive months. (Doc. 59-5 at 6).   Thus, the Tolivers' statements that they visited the Keebles once per week did not cause Mr. Toliver to succeed in obtaining Social Security benefits, nor does it appear to have been material to the SSA's decisions.   While not dispositive, the Court finds this to be a relevant factor that counsels against the application of judicial estoppel here.   Finally, the Court finds no unfair advantage will inure to the Defendants' benefit in the absence of estoppel.   Accordingly, the Court declines to apply judicial estoppel and will now turn to the merits of Owners' motion for summary judgment.

## B. Whether the Tolivers Are Entitled to Coverage Because They Are Pamela Keeble's "Relatives"

Owners argues that it is entitled to summary judgment on the issue of coverage because the evidence shows that the Tolivers did not "reside" with Mrs. Keeble at the time

of Mr. Toliver's accident.  Specifically, Owners contends that the Defendants produced no evidence that Mr. or Mrs. Toliver intended to permanently remain at Mrs. Keeble's home. The Defendants argue that, based on the Tolivers' testimony that the Tolivers spent every night at Mrs. Keeble's home from January 2020 through November 2020, a reasonable jury could conclude that they resided with her when the accident occurred.

"Federal courts sitting in diversity apply the substantive law of the state in which the case arose." *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1132 (11th Cir. 2010) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  The parties agree that Alabama law governs interpretation of the Policy.  "When analyzing an insurance policy, a court gives words used in the policy their common, everyday meaning and interprets them as a reasonable person in the insured's position would have understood them." *State Farm Mut. Auto Ins. Co. v. Brown*, 26 So. 3d 1167, 1169 (Ala. 2009) (per curiam) (citation omitted). "If a word or phrase is not defined in [an insurance] policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it." *Travelers Cas. & Sur. Co. v. Ala. Gas Corp.*, 117 So. 3d 695, 700 (Ala. 2012) (per curiam) (alteration in original) (citation omitted).  "[I]f a provision in an insurance policy is found to be genuinely ambiguous, 'policies of insurance should be construed liberally in respect to persons insured and strictly with respect to the insurer.'" *Id.* (citation omitted).  "The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308 (Ala. 1999).

Alabama courts have opined that, to "reside" with the named insured, "an individual must be more than a temporary or transient visitor, and must actually live with others in the same household for a period of some duration." *Mathis v. Emps.' Fire Ins. Co.*, 399 So. 2d 273, 275 (Ala. 1981). "The word 'residing' is an ambiguous, elastic, or relative term, and includes a very temporary, as well as a permanent, abode. . . . It indicates some intent of permanency of occupation as distinguished from boarding or lodging, but does not require the intent of permanency to the degree required in domicile." *Crossett v. St. Louis Fire & Marine Ins. Co.*, 269 So. 2d 869, 873 (Ala. 1972) (citation omitted).

Several cases address whether a college student who spends most of their time away from their parent's home nonetheless resides with their parent. *See, e.g.*, *Crossett*, 269 So. 2d 869; *State Farm Mut. Auto. Ins. Co. v. Hanna*, 166 So. 2d 872 (Ala. 1964). The Court summarizes these cases to provide background and context for the parties' arguments. In *Hanna*, a father filed a claim under his son's insurance policy, which excluded from coverage "[b]odily injury to the insured or any member of the family of the insured residing in the same household as the insured." 166 So. 2d at 873–74. The evidence established that the insured son, who was attending college, spent his vacations and occasional weekends in the family home, kept some of his possessions there, gave it as his address to the draft board, and listed it on his driver's license. *Id.* at 874–75. The Alabama Supreme Court affirmed the trial court's ruling that the father was not "residing in the same household" as the insured son, and thus the exclusion was inapplicable and coverage was available. *Id.* at 877. The court explained that the word "residing" is "an ambiguous,

13

elastic, or relative term, and includes a very temporary, as well as a permanent abode." *Id.*
at 876.   The court further opined what where an insurance policy's provisions are
ambiguous, the "construction will be adopted which is favorable to the insured." *Id.*

In *Crossett*, a college student was sued by his classmate following an altercation at
school. 269 So. 2d at 870.  The student's father had a homeowners insurance policy which
defined "insured" to include relatives of the named insured (the father) if "residents of the
same household." *Id.*  The insurance company filed a declaratory judgment action seeking
to determine that it had no duty to defend the son in the lawsuit. *Id.*  The evidence showed
that although the son was attending Auburn University and the parents lived in
Birmingham, the son had a room in the family home and came home during all holidays
and on most weekends. *Id.*  Additionally, the son kept all of his personal belongings at the
family home, except the clothes he needed at school, his radio, books, and personal
necessities. *Id.*  The son listed his parents' address on his driver's license and registered for
the draft near the family home. *Id.*

The trial court determined that the son was not an insured under the policy, *id.*, but
the Alabama Supreme Court reversed, *id.* at 875.  The court relied on three cases in
determining the trial court erred: *American States Insurance Co. v. Walker*, 486 P.2d 1042
(Utah 1971), *Manuel v. American Employees Insurance Company*, 228 So. 2d 321 (La. Ct.
App. 1969), and *Hanna*. *Id.* at 872–74.  In *Walker*, the Utah Supreme Court held that the
daughter of insured, who kept some furniture, books, and clothing in her father's home in
Idaho, who had an Idaho driver's license and voted there, but who had gone to Utah to

college and was in training as an x-ray technician, was a "resident of the same household" as her insured father, thus was covered under his automobile liability insurance policy. *Id.* at 872. The Utah Supreme Court opined: "A resident of a household is one who is a member of a family who live under the same roof. Residence emphasizes membership in a group rather than an attachment to a building. It is a matter of intention and choice rather than one of geography." *Id.*

In *Manuel*, the Louisiana Court of Appeals held that a college student who rented an apartment at college but kept most of his possessions at his father's house, returned there every weekend and on vacations, and who listed his father's house as his permanent mailing address, was a resident of his father's household for purposes of his father's insurance policy. *Id.* The *Manuel* court opined that "even if the temporary dwelling places in which [the student] lived during the college week were his residences, nevertheless, he was also a resident in his father's home, where he maintained his possessions and to which he returned weekly and which was, in fact, his permanent home." *Id.* The court further opined: "While a person may have only one domicile (his permanent residence and principal establishment), he may as a matter of fact have more than one residence (his actual dwelling place, or where he actually lives)." *Id.* The court explained that the student "had never moved from his permanent home with his parents" and that "his schooling residences were intended to be temporary in nature, and he had never severed his ties with his parents' home as his permanent residence." *Id.* The *Crossett* court stated that *Manuel* was factually nearly on "'all-fours' with the case at bar." *Id.*

15

Citing *Hanna*, the *Crossett* court determined that the term "residents" was "clearly" ambiguous and capable of two rational constructions, and thus the construction in favor of the insured should be adopted. *Id.* at 874. The construction in favor of the insured, the court concluded, was for the insured's son to be defended in the lawsuit filed against him. *Id.* Thus, the court held that the son was a resident of his parents' household at the time of the accident. *Id.* The court rejected the argument that *Hanna* authorized a finding that the son was not a resident of his father's household. *Id.* The court reasoned that this argument overlooked the "obvious basis" for *Hanna*'s holding, which was that the court found the exclusionary clause's phrase "residing in the same household" ambiguous and accordingly adopted the construction favorable to the insured. *Id.* Having found "an almost identical clause to be ambiguous," the *Crossett* court "follow[ed]" the same rule" as in *Hanna* and adopted the construction favorable to the insured and extending coverage. *Id.*

The Defendants rely on another case involving a college student, *Bayles v. Southern Guaranty Insurance Co.*, 484 So. 2d 1065 (Ala. 1986). In *Bayles*, a twenty-one-year-old was driving a car when it ran off the road and hit a tree, and he subsequently was sued by one of the car's occupants. *Id.* at 1066. The driver's father had an auto insurance policy which extended coverage to residents of the father's household. *Id.* The insurance company filed a declaratory judgment action seeking to determine that it had no duty to defend the son in the lawsuit. *Id.* The court entered directed verdict in favor of insurer. *Id.* The Alabama Supreme Court reversed, concluding there was direct evidence that the son was a resident of his father's household at the time of the accident. *Id.* 1067, 1069. The

16

accident occurred in July; the son had graduated from junior college in May, and he entered Auburn University that fall. *Id.* at 1067. "[The son] had a bedroom at [his father's] home where he kept most of his clothing and belongings; he ate many of his meals at [his father's] home; he received his mail there; he shared a bathroom with his father and kept most of his toiletries there." *Id.* The evidence also showed that during the summer when the accident occurred, the son spent many nights at a friend's "bachelor pad" and also spent some nights in a mobile home in Pineapple, Alabama, near his father's farm. *Id.* The son spent less than half of the forty-five nights prior to the accident at his father's home. *Id.*

The Defendants argue that *Bayles* precludes a determination that Owners is entitled to summary judgment because, according to the Tolivers' testimony, the Tolivers spent much more time at Mrs. Keeble's home in the seven months preceding the accident than the son in *Bayles* spent at his father's house in the forty-five days preceding the accident. The Defendants contend that if *Bayles* was sent to the jury under those facts, then this case should be as well. While the Court finds *Bayles* relevant, the Court is not persuaded that it is dispositive. In *Bayles* and other cases involving college students, the students previously lived under the same roof as the insured parent and then went off to college, living at school but returning and staying at the parent's house on occasion, along with other indicia that the parent's house remained the student's permanent home, such as the student keeping personal belongings there. The question in those cases was essentially whether a child *remains* a resident of their parent's household notwithstanding the child's attendance at college and physical absence from the parent's household for portions of the

17

year.  The cases emphasize that with college students the key inquiry is whether their absence from the family household is intended to be permanent or temporary.  Unlike *Bayles*, this case presents a situation where two families lived apart in separate households for years, and then one family unit moved in with another—and stayed for ten months—for childcare and household assistance attributable to one family member's medical problems.

The Defendants also rely on *Davis v. State Farm Mutual Automobile Insurance Co.*, 583 So. 2d 225 (Ala. 1991).  In *Davis*, the court addressed whether an insured's divorced adult son "live[d] with" the insured father and thus was entitled to coverage under the father's auto insurance policy. *Id.* at 226.  The son was in a car accident with an uninsured driver and sought uninsured motorist coverage under his father's policy. *Id.*  The policy extended coverage to "relatives," which the policy defined as a person who "lives with" the named insured (the father). *Id.*  The trial court held that the son did not "live with" his father and granted judgment in favor of the insurance company, but the Alabama Supreme Court reversed. *Id.*  The evidence showed as follows: The son had an apartment with his wife, but after their divorce, he began spending nights at his father's house, where he kept his clothing, toiletries, and personal possessions. *Id.* at 227.  Four years after the divorce, the son was injured at work and thus began spending even more time at his father's house, where he had a bedroom and ate all his meals. *Id.*  The son kept no food, clothing, or personal possessions at the apartment, but he continued to receive mail there and listed it

18

as his permanent residence on documents. *Id.* at 228.  Additionally, he and his friends used the apartment as a "hang out." *Id.*

The car accident occurred approximately six years after the son divorced and began spending nights at his father's house. *Id.* at 226, 228.  The son maintained that he did not spend any nights at the apartment during this time, whereas the insurance company presented witness testimony that the son occasionally spent nights at his apartment. *Id.* at 228.  However, the court found those factual disputes immaterial. *Id.*  The court determined that the word "live" was synonymous with "reside." *Id.* at 230.  Thus, the court held, citing *Crossett*, that the phrase "live with" was "an 'ambiguous, elastic, or relative term, and includes a very temporary, as well as a permanent, abode.'" *Id.* (citation omitted).  The court also reasoned that, because it found one of the policy's provisions ambiguous, it was required to construe the policy in favor of the insured. *Id.*  The court held that the trial court did not err in finding that the son "lived" at the apartment, but the trial court did err in determining that the son did not also "'live with' his father at the time of the accident for purposes of uninsured motorist coverage." *Id.* at 230.  While the son in *Davis* spent nights with his father for a longer period of time than the Tolivers say they stayed with the Keebles, the Court finds *Davis* factually similar in other material respects and thus instructive.

Informed by the above caselaw, the Court concludes that the Policy's phrase "resides with you" is ambiguous. Viewing the facts in the light most favorable to the Defendants and construing the Policy in favor of the insured, a reasonable jury could

conclude that the Tolivers resided with Pamela Keeble at the time of the August 8, 2020 accident.  According to the Tolivers, they moved in with the Keebles in January 2020 when Mr. Toliver was diagnosed with bipolar disorder and spent every night with the Keebles until November 2020.  The purpose of the move was for Mrs. Keeble to assist the Tolivers with childcare and with caring for Mr. Toliver.  At this time, Mrs. Toliver was also taking online classes.  Mrs. Toliver finished her online classes in November 2020, at which point the Tolivers moved out of the Keeble home and back to their Streyer Street home.  A reasonable jury could conclude that the Tolivers were more than temporary or transient visitors at Mrs. Keeble's home, *see Mathis*, 399 So. 2d at 275, and that the length and circumstances of their stay manifested "some intent of permanency of occupation as distinguished from boarding or lodging," even if not "the intent of permanency to the degree required in domicile," *see Crossett*, 269 So. 2d at 873 (citation omitted).  That the Tolivers kept their Streyer Street home and continued to give it as their address on documents does not change this conclusion. *See Davis*, 583 So. 2d at 228, 230.  Thus, a reasonable jury could conclude that the Tolivers resided with Mrs. Keeble at the time of the accident.

The Court is not persuaded that the cases Owners relies upon compel a different conclusion.  First, Owners relies on two cases with similar policy language involving non-college student family members who were determined not to reside with the named insured: *Rice v. State Farm Fire & Casualty Co.*, 628 So. 2d 582 (Ala. 1993) and *American Liberty Insurance Co. v. Carpenter*, 547 So. 2d 402 (Ala. 1989).  In *Rice*, the court addressed

whether the named insured's thirty-year-old son was a "resident" of his parents' household. 628 So. 2d at 583.  For seven years, the son had lived in a mobile home 100 feet from his parents' house; the parents owned the mobile home and the land on which it stood. *Id.*  The son had no belongings in his parents' house, and he did not have a key to their house, nor did they have a key to his mobile home. *Id.*  The son ate some meals with his parents in their house and used their phone. *Id.*  In the seven years he had lived in the mobile home, he had not spent a single night in his parents' home. *Id.*  The court held that the son was not a resident of his parents' household. *Id.* at 584.  The court cited prior cases involving college students—*Crossett* and *Bayles*—and noted that of key importance in those cases was whether the childrens' school residences were intended to be temporary. *Id.*  The court reasoned that because the son had lived in the mobile home for seven years and had not spent a single night in parents' home during that time, the son had not manifested an intent that his stay in the mobile home was intended to be temporary. *Id.*

In *Carpenter*, the court addressed whether Harry Carpenter, who owned and shared a beach house with his brother Gil, was covered under Gil's homeowner's insurance policy as a resident of Gil's household. 547 So. 2d at 403.  The stipulated facts included that Gil, Gil's wife, Harry, and Harry's wife jointly owned a beach house in Florida. *Id.*  The couples alternated weekends staying in the beach house between February and September or October each year. *Id.*  Additionally, "the two couples would use the beach house at the same time two or three times a year." *Id.*  Gil and his wife had a homeowner's insurance policy which primarily covered their Dothan residence but listed the beach house as an

additional insured residence for liability coverage only. *Id.*  The policy defined "insured" to mean "you and the following residents of your household: relatives." *Id.*  The key issue in the case was the meaning of "residents of your household." *Id.*  The court noted that it had previously found the term "resident" ambiguous but determined that the term was not ambiguous under the current facts. *Id.* at 404.  The court held that Harry was not a member of Gil's household, reasoning that it was "clear that these two couples, although related, have their separate nuclear family units; that they reside in separate homes in Dothan; and that they are residents of separate households." *Id.*

The Court finds that neither *Rice* nor *Carpenter* establishes that the Tolivers as a matter of law did not reside with Mrs. Keeble at the time of the accident.  Unlike *Rice*, where the son did not spend a single night in his parents' home over a seven-year period, here the Tolivers testified they spent every single night at Mrs. Keeble's home over a ten-month period, including approximately seven months prior to the accident.  In *Carpenter*, the two families spent comparably few nights together, and the beach house in which they occasionally stayed together was neither family's primary residence.  In the Court's view, both families in *Carpenter* were only temporary or transient visitors to the beach house and used it as a place of boarding or lodging.

Owners also cites *Nationwide Insurance Co. v. Rhodes*, 870 So. 2d 695 (Ala. 2003), in support of its position that the Tolivers did not "reside" with Mrs. Keeble.  In *Rhodes*, the insurance policy defined "relative" as a person who "regularly lives in your [the insured's] household." 870 So. 2d at 697.  The court observed that Webster's Dictionary

defined "regular" to mean "usual, normal or customary." *Id.* at 698.  The court recognized that the Alabama Supreme Court previously found the phrases "lives with" and "lives in your household" ambiguous, but the court noted that "words of refinement" can clarify an ambiguous phrase to remove the ambiguity. *Id.*  The court held that "'regularly lives in your household' is unambiguous, meaning someone who usually, normally, or customarily lives in the insured's household." *Id.*  Ultimately the court concluded that the insured's adult son did not "regularly live" in his parents' household because his once-a-month overnight visits, occasional meals, and receipt of mail at his parents' house did not indicate that their house was his "usual, normal, or customary residence." *Id.*  The court also opined that the fact the son and his wife owned another residence—a mobile home—where he "admittedly spen[t] the greatest portion of his time weighs strongly against any conclusion other than that his mobile home is his usual, normal, or customary residence." *Id.* at 698–99.  The Court finds *Rhodes* materially distinguishable from this case because the policy in *Rhodes* contained a "word of refinement"—"regularly"—which clarified the otherwise ambiguous phrase "lives with" to remove the ambiguity.  Here, the Policy contains no such words of refinement and instead uses the ambiguous phrase "resides with."

For the reasons stated, a reasonable jury could conclude that the Tolivers resided with Mrs. Keeble at the time of the accident.  Accordingly, Owners' motion for summary judgment is due to be denied to the extent that Owners seeks a declaration that it owes no coverage to Mr. and Mrs. Toliver.

### C. Whether the Tolivers Are Entitled to Coverage Under Alabama's Uninsured Motorist Statute

The Court next addresses the Defendants' alternative argument that Mr. and Mrs. Toliver are entitled to coverage under Alabama's Uninsured Motorist Statute, Ala. Code § 32-7-23. The statute provides:

> No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death . . . arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered . . . in this state . . . unless coverage is provided therein . . . *for the protection of persons insured thereunder* who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom . . . .

Ala. Code § 32-7-23(a) (emphasis added). Under the statute, "once an automobile liability policy is issued extending coverage to a certain class of insureds . . . , uninsured motorist coverage must be offered to the same class of insureds." *State Farm Auto. Ins. Co. v. Reaves*, 292 So. 2d 95, 99 (Ala. 1974), *overruled in part on other grounds*, *State Farm Mut. Auto. Ins. Co. v. Wallace*, 743 So. 2d 448 (Ala. 1999) (overruling portion of *Reaves* relating to prejudgment interest on sums paid under uninsured motorist coverage).

The Defendants argue that the Policy's Amendatory Endorsement extends liability coverage to Mr. and Mrs. Toliver. The Endorsement provides that:

> [Owners] will also pay damages for bodily injury and property damage for which the insured becomes legally responsible because of or arising out of:
>
> ***
>
> (b) An auto . . . you do not own or lease which is not used in connection with your business (other than a motorcycle, moped, motor scooter, midget auto or go cart), when used by:
>     1) You;
>     2) Any person to whom you regularly furnish an auto . . . or their spouse,

if a resident of the same household;
3) Your relatives not owning an auto . . . ; or
4) Any person not owning an auto . . . who resides with any person shown in 1), 2) or 3) immediately above to whom you regularly furnish an auto . . . and who is related to such person or his or her spouse by blood, marriage or adoption including a ward or foster child who resides with such person.

(Doc. 36-1 at 74) (emphasis omitted). An "auto" is defined as, among other things, "a land motor vehicle." (*Id.* at 16, para. C). The Defendants contend that because Mrs. Toliver "regularly" drives a van owned by Keeble Enterprises and provided to her by Mrs. Keeble, Mr. and Mrs. Toliver have liability coverage under paragraphs 2, 3, and 4 of the Amendatory Endorsement. According to the Defendants, this means that the Tolivers are within the class of insureds to whom coverage extends and the Tolivers are thus entitled to uninsured motorist coverage under the statute.

The Court first notes that Mrs. Toliver did not testify that she "regularly" drives a van owned by Keeble Enterprises, or that Mrs. Keeble provided the van to her. Mrs. Toliver testified only that she drives a van owned by Keeble Enterprises. However, Owners does not dispute the Defendants' framing of the facts but instead argues that the Policy does not extend liability coverage to the Tolivers because, based on the endorsement's language, the Policy affords coverage only to the insured and does not extend coverage to the individuals in paragraphs 2, 3, or 4.

The Court agrees with Owners. The Amendatory Endorsement provision relied upon by the Defendants does not extend coverage to the individuals listed in paragraphs 2, 3, and 4. Rather, it provides coverage when the *insured* becomes legally responsible for

25

certain damages caused when an "auto" is used by an individual listed in paragraphs 2, 3, or 4. (Doc. 36-1 at 74).  It provides additional coverage for the insured but does not extend coverage to a new class of insureds.  Alternatively, the Courts finds that liability coverage is not available to the Tolivers under the Amendatory Endorsement because motorcycles are excluded.  It is undisputed that Mr. Toliver was operating a motorcycle when the accident occurred.

As explained above, Alabama law guarantees uninsured motorist coverage only to the class of insureds to whom an insurance policy extends liability coverage. *See* Ala. Code § 32-7-23(a); *Reaves*, 292 So. 2d at 99.  Because the Tolivers are not within the class of insureds to whom the Policy extends liability coverage, they are not entitled to uninsured motorist coverage under § 32-7-23.

### D. Whether Mrs. Toliver's Claim Increases the Policy Limits

Owners additionally argues that Mrs. Toliver's claim does not increase the applicable Policy limits because her claim does not trigger a separate "per person" limit, but even if it did, the claims remain subject to the "per occurrence" limit of $300,000 (stackable three times, for a total of $900,000).  The Court agrees.  Assuming without deciding that Mrs. Toliver's claim does trigger a separate "per person" Policy limit of $300,000 (stackable three times), Policy coverage remains limited to $300,000 (stackable three times) *per occurrence*.  The Policy states that the limit "for 'each occurrence'" is the maximum Owners will pay "for all compensatory damages, including but not limited to loss of consortium, because of bodily injury to two or more persons in any one occurrence."

(Doc. 36-1 at 66, para. 4(b)) (emphasis omitted).  The Policy further provides that the insurance limit "is not increased because of the number of . . . [c]laims made or . . . [p]ersons injured." (*Id.* at 66, para. 4(c)).  The Defendants do not argue that there is more than one occurrence.  Mr. Toliver's claim and Mrs. Toliver's loss of consortium claim plainly arise out of a single "occurrence" as defined by the Policy: Mr. Toliver's August 8, 2020 motorcycle accident.  Accordingly, the Court finds Owners' motion for summary judgment is due to be granted to the extent it seeks a declaration that the Policy limit for one occurrence is $300,000 stackable three times, for a total of $900,000.

### E. The Defendants' Motion to Strike

The Defendants' motion to strike seeks to strike or exclude from consideration the police accident report, certain medical bills, and a letter from attorney Gantt Pierce cited in Owners' motion for summary judgment.  The Court did not consider this evidence in the course of its decision, nor would the evidence, if considered, change the Court's opinion. Accordingly, the motion to strike is due to be denied as moot.

## VI. CONCLUSION

For the reasons stated, it is hereby ORDERED as follows:

1. The Plaintiff's motion for summary judgment (doc. 35) is GRANTED to the extent it seeks a declaration that the Policy limit for one occurrence is $300,000 stackable three times, for a total of $900,000; and DENIED to the extent it seeks a declaration that Owners owes no coverage to the Tolivers under the Policy;

2. The Defendants' motion to strike hearsay evidence (doc. 40) is DENIED AS MOOT.

Done this 7th day of February, 2022.

_____/s/Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE